In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2418 & 99-2971

LINDA PLACE,

Plaintiff-Appellee/Cross-Appellant,

v.

ABBOTT LABORATORIES,

Defendant-Appellant/Cross-Appellee.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 94 C 5491--David H. Coar, Judge.

ARGUED April 21, 2000--DECIDED June 1, 2000

Before BAUER, KANNE, and EVANS, Circuit
Judges.

EVANS, Circuit Judge.  We hope this
musty Title VII case is one of the last
we will see in which events straddle the
enactment of the Civil Rights Act of
1991. And we say good riddance to such
cases for they put the district court in
the delicate position of parceling out
what must be decided by the judge and
what may be decided by a jury. A good
deal of this saga preceded the pivotal
date of November 21, 1991, when the new
law for the first time gave Title VII
litigants the right to a jury trial and
allowed plaintiffs to seek punitive and
compensatory damages. 42 U.S.C. sec.
1981a. These changes in the law, of
course, are not retroactive to conduct
that occurred prior to November 21, 1991.
Landgraf v. USI Film Prods., 511 U.S. 244
(1994).

Linda Place began working at Abbott
Laboratories in 1986 as a biology
research associate. In a rather hackneyed
development, she and her supervisor, Dr.
Charles Harrington, got drunk at a
company Christmas party in December 1990
and afterward found their way into the

same hotel bed./1 The details of this encounter are worth recalling.

The Christmas party, attended by assorted Abbott scientists, chemists, and technicians, was at the Princess restaurant in Libertyville, and the wine was flowing. After several hours, some of the revelers, including Place and Harrington, repaired to the apartment of fellow worker Peggy Connerty in Evanston. Place and Harrington drove together in Place's Camaro because she had had too much to drink and Harrington was in "better shape." More drinking followed at Connerty's, but that apparently ended when the host passed out.

After the Connerty shindig broke up, Place and Harrington returned to the restaurant where Harrington had left his car. Harrington drove Place's car because, as she testified, she "wasn't capable of driving." During this return trip, Harrington suggested they go to a hotel--instead of their separate ways-- after they got to his car. Place said she had no desire to accept Harrington's proposition but, rather inexplicably, she and Harrington then drove to a motel in their separate cars. A sexual encounter followed.

The Christmas party tryst mushroomed into a sexual affair that lasted around 6 months. Place could not recall the number of sexual encounters but did remember some of the locations, including behind a locked door in an Abbott lab, outside in a forest preserve, and in a condominium she owned with her husband (Place was married, as was Harrington).

Place testified that the relationship was coercive from start to finish and that she had sex with Harrington--over a 6-month period--only because he controlled her performance evaluation. Harrington said the affair was entirely consensual and denied telling Place that she would get a better job evaluation if she had sex with him. District Judge David H. Coar, in rejecting Place's sexual harassment claim, found her to be a less than impressive witness. As to the Christmas party liaison, for example, Judge Coar found "that neither plaintiff nor Harrington is credible" but that Harrington's testimony was more believable.

During the spring following the Christmas party, Abbott promoted Place from a grade 13 to a grade 15 scientist and, as part of routine restructuring, transferred her to a different job where Harrington no longer was her supervisor, though she still regularly had to work with him.

In July 1991, after the affair ended, Place complained to Abbott that Harrington was sexually harassing her. Abbott investigated, warned Harrington, set up an arrangement where Harrington and Place could speak to each other only in the presence of a third party, and in October 1991 transferred both Harrington and Place to other jobs where they wouldn't have to deal with each other. Though they retained their same titles, pay, and benefits, both considered the moves demotions. Place said she lost her supervisory responsibilities, her office, her telephone, and had to do boring laboratory bench work. Abbott denies that Place's transfer was a step down, noting that in her new position Place performed duties previously done by a grade 17 scientist and that she needed time to familiarize herself with her new research project.

Place claimed that because of the affair, the harassment, and the transfer, her emotional state deteriorated to the point where, in November 1991, she took a medical leave of absence. Financially, this was not too bad a deal because she received her full salary for 6 months and lesser benefits for 6 weeks after that. But Abbott terminates the employment of anyone who fails to return to work from disability leave within one year (though long-term disability payments might continue thereafter), and in May 1992, when her 6 months of full-time disability benefits expired, Place's psychologist cleared her to return to work. Abbott insisted, however, that she first undergo an independent medical examination and referred her to an outside psychologist, John Jochem. Fearing that she was being set up for failure, Place snapped on her tape recorder when the session with Jochem began. When he balked at being taped, Place walked out. Because Place refused to undergo the independent medical examination, Abbott refused to let her return to work. When Place failed

to return to work within one year, Abbott terminated her as an employee.

Unable to find another science job, Place went to law school and now is a solo practitioner in Waukegan, where she has--apparently successfully--represented other former employees who have sued Abbott. She also filed her own ADA, ERISA, and Title VII claims against Abbott. The ADA and ERISA claims were knocked out on summary judgment, but the Title VII case went to trial.

Judge Coar was the finder of fact on Place's sexual harassment claim (involving events that occurred prior to November 21, 1991) and a jury was the finder of fact on the retaliation claim (involving events that took place both before and after November 21, 1991). Judge Coar found that Place had not been sexually harassed, a decision that she does not appeal. A plaintiff whose underlying discrimination claim fails may still prevail on a claim that she was retaliated against for complaining about discrimination, see Pryor v. Seyfarth, Shaw, Fairweather & Geraldson, 2000 WL 568330 (7th Cir. May 11, 2000), and Place did so. The jury found that Abbott retaliated against Place and awarded her $389,656 in lost wages and $125,000 in compensatory damages, for a total of $514,656. Abbott appeals that outcome. Judge Coar denied Place front pay and would not let her pursue punitive damages. Place cross-appeals those decisions. (Place had counsel at trial, but handled her appeal pro se.)

Place's retaliation claim is founded on two events: first, her transfer in October 1991 to a different position at Abbott, and second, the company's insistence in May 1992 that she undergo an independent medical examination, her refusal of which led to her dismissal in December 1992.

To understand Place's retaliation claim, the jury obviously needed to hear about what happened before November 21, 1991. See Hennessy v. Penril Datacomm Networks, Inc., 69 F.3d 1344, 1349 (7th Cir. 1996). Judge Coar, however, allowed in the pre-November 1991 evidence not just as explanatory background information, but also for purposes of liability and compensatory damages under the continuing

violation theory. As a question of law made in the context of denying Abbott's Rule 50 motion, we review that decision de novo.

The continuing violation theory allows a plaintiff to reach back to get relief for an act of discrimination that occurred outside the statute of limitations by linking it as one continuous act with a discriminatory act that took place within the limitations period. See Miller v. American Family Mut. Ins. Co., 203 F.3d 997, 1003-04 (7th Cir. 2000); Speer v. Rand McNally & Co., 123 F.3d 658, 663-64 (7th Cir. 1997); Selan v. Kiley, 969 F.2d 560, 564-65 (7th Cir. 1992). "A continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period." Dasgupta v. University of Wis. Bd. of Regents, 121 F.3d 1138, 1139 (7th Cir. 1997).

Whether the theory may be applied to the situation at hand is unsettled. Landgraf, 511 U.S. 244, which held that the changes brought about by the Civil Rights Act of 1991 were not retroactive, did not involve a claim that straddled November 21, 1991, but rather was a case in which the conduct already had taken place and the case already was pending when the new law took effect. On the one hand, Landgraf seems to dig a moat between plaintiffs seeking compensatory and punitive damages and anything that occurred before November 21, 1991. On the other hand, the logic of the continuing violation theory that stitches old and new conduct together into one seamless violation for statute of limitation purposes would seem to apply with equal force to the nonretroactivity of a new law. See Leonard Charles Presberg, The Civil Rights Act of 1991, Retroactivity, and Continuing Violations, 28 U. Richmond L. Rev. 1363, 1402-04 (1994). We have suggested that the continuing violation theory "is utilized only in the context of a challenge to the timeliness of a cause of action," Taylor v. Western and S. Life Ins. Co., 966 F.2d 1188, 1196 (7th Cir. 1992), but this single sentence made in a different context is hardly dispositive. The circuits that have tackled this issue head-on have split.

Compare Tomasello v. Rubin, 167 F.3d 612, 620 (D.C. Cir. 1999) ("an award of compensatory damages for preenactment conduct would have an impermissible effect"), and Caviness v. Nucor-Yamato Steel Co., 105 F.3d 1216, 1220 n.1 (8th Cir. 1997) ("[w]e are not familiar with any Eighth Circuit law where the concept of continuing violation, ordinarily associated with statutes of limitations issues, has been employed to overcome a non-retroactivity rule") with DeNovellis v. Shalala, 124 F.3d 298, 307 n.4 (1st Cir. 1997) ("a continuing violation theory could be applied to any time requirement imposed by Title VII, whether it be the effective date of an amending statute, as here, or a statute of limitations"). Resolving this nettlesome legal issue is unnecessary to resolving this appeal, however, because the two alleged acts of retaliation against Place simply do not fit the continuing violation mold.

We have recognized three types of continuing violations: where the exact day of the violation is difficult to pinpoint because the employer's decisionmaking process takes place over a period of time; where the employer has a systematic, openly espoused policy alleged to be discriminatory; and where the employer's discriminatory conduct is so covert that its discriminatory character is not immediately apparent. Selan, 969 F.2d at 565. The first two scenarios clearly do not apply to this situation and the third does not fit, either. The covert variant applies to plaintiffs who realize only with the benefit of hindsight that they were discriminated against. Moskowitz v. Trustees of Purdue Univ., 5 F.3d 279, 281-82 (7th Cir. 1993). If, however, the plaintiff "knows or with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed" her, the plaintiff must sue over that act within the regular statute of limitations. Id. at 282.

Applying the continuing violation theory to this situation would require the retaliatory nature of Place's (pre-November 1991) internal job transfer to be so subtle that she did not recognize it as retaliatory until the (post-November 1991) independent medical examination demand. The continuing violation scenario makes most sense in a sexual harassment

case, where the first offensive comment or inappropriate touch may not alert the victim to the harassing quality of the conduct. See Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1166 (7th Cir. 1996). A job transfer is quite different. Like being fired, demoted, or not promoted, a job transfer is a single, significant event, not a continuing act. See Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1997). Unlike low-level harassment that over time grows in intensity or in cumulative effect, a job transfer is a concrete, discrete development. If Place's transfer into a different job where she held the same title and received the same pay was retaliatory at all, its retaliatory nature was immediately palpable. Because Place could have known at the time that the transfer was retaliatory--if indeed it was retaliatory--she cannot through the continuing violation theory link her transfer to Abbott's independent medical examination requirement some 8 months later.

Consequently, the district court erred in allowing the jury to consider Place's October 1991 transfer for purposes of liability and damages. The jury's retaliation decision should have been based only on the company's demand in May 1992 that she undergo an independent medical examination, a demand that when defied led to Place's termination.

Place argues, however, that this error was harmless. The jury answered "yes" to a special interrogatory that asked: "Was Abbott's refusal to reinstate Place without an independent medical examination an act of retaliation?" Because the independent medical examination issue was properly within the jury's bailiwick, and because the jury explicitly found the examination requirement retaliatory, Place believes that part of the verdict is valid. As a result, she says that at least the $389,656 she was awarded in back pay should stand, since that part of the award stemmed from her termination that resulted from her refusal to undergo an unrecorded independent medical examination.

We disagree, for two reasons. First, the jury's finding of liability might have

been improperly influenced by Place's effort to prove that her transfer was retaliatory. As we mentioned earlier, the jury would have heard this evidence in any event. Because the jury was not instructed that this evidence could not be taken into account in determining liability and damages, however, what should have been outside the jury's purview might have seeped into the jury's decision regarding liability. We will never know whether the jury thought the job transfer was retaliatory because no interrogatory was given on that question, and we cannot speculate on whether the jury's decision was rooted solely on a permissible ground or on both permissible and impermissible grounds.

Second, no reasonable jury could have found Abbott's independent medical examination requirement retaliatory. We review de novo a trial court's grant or denial of judgment as a matter of law under Federal Rule of Civil Procedure 50. Mathur v. Board of Trustees of S. Ill. Univ., 2000 WL 307119, *2 (7th Cir. 2000). The question is whether a rational jury could have reached the result this jury reached. Id. In deciding this question, we may not substitute our view of contested evidence for the jury's. Id.

The record does not support an inference that Abbott was retaliating for Place's earlier complaints of sexual harassment by requiring her to take an independent medical examination before returning to work from a long disability leave. Abbott required any employee who had been out on disability leave for at least 5 days to coordinate their return to work with the company's health department. The company did not require an independent medical evaluation of every employee who wished to return to work from disability leave, but requiring such an examination was not unusual. Every year, several employees coming back from disability leave were first sent to independent medical evaluations that involved psychological evaluation, according to Brockton Weisenberger, at the time Abbott's director of corporate employee health. Place introduced no evidence that similarly situated individuals were treated differently. She pointed to records indicating that one unidentified Abbott employee was allowed to continue to work despite refusing a psychological evaluation, but in that

case the evaluation had been recommended after the employee had been voluntarily involved in Abbott's employee assistance program. By contrast, Place had been out on disability leave and was required to undergo an independent medical examination by the company's health department.

While working at Abbott, Place appears to have been a tempestuous, high-maintenance employee who did good scientific work but had regular run-ins with her supervisors and co-workers. When one of Place's supervisors, Meta Franklin, made a decision Place didn't like, Place angrily leaned forward and threatened: "You'll pay for that." Franklin also testified that on another occasion she saw Place threaten a co-worker, Ms. Connerty (the host, you'll recall, of the post-Christmas party get-together), with whom she wasn't getting along. Weisenberger said he was concerned that Place was so angry at the company that she might do harm if returned to the workplace. Even Place's own psychologist, Katie Gienapp, who believed Place was ready to return to work and posed no danger, testified that she could understand why an employer might want a second opinion.

We do not hold, as Abbott suggests, that requiring an independent medical examination could never constitute an adverse employment action. For example, an employer that never required men, but always required women, to undergo independent medical examinations before returning to work from disability leave would almost certainly be discriminating. In this case, however, the evidence does not support the inference that Place was being singled out. There also is no evidence that the independent evaluation had been rigged against her or that Abbott played any role in Jochem's refusal to let Place tape-record their session. Abbott had a discretionary policy to require independent medical examinations when its health department thought they were warranted. Place's previous threats to other Abbott employees, the emotional problems that prompted her disability leave, and her continuing anger at the company all raised warning flags. In a business where the destruction of equipment and research records could do great damage, and in an

era when disgruntled workers all too regularly take out their frustrations with a gun, Abbott's desire to get a second opinion before welcoming Place back to work hardly seems unreasonable. All Place had to do was spend a short amount of time, at Abbott's expense, with a psychologist. If she had done that, she probably would have gotten her job back. If Abbott still had barred the door after the evaluation showed she was fit to return to work, then she would have a strong case for retaliation. But under these circumstances no reasonable jury could have concluded that the company's requirement for an independent psychological evaluation was payback for Place's complaints of sexual harassment nearly a year before.

The question that remains is whether Place's claim that her pre-November 1991 internal transfer constituted retaliation, which was erroneously considered by the jury the first time, must now be remanded to Judge Coar. We think not, again because for two reasons no reasonable finder of fact could find that the transfer was retaliatory.

First, whether the transfer constituted an adverse employment action is dubious. The fact that Place received the same pay and benefits and held the same title in her new position does not necessarily preclude her retaliation claim, for "adverse actions can come in many shapes and sizes." Knox v. Indiana, 93 F.3d 1327, 1334 (7th Cir. 1996) ("[n]o one would question the retaliatory effect of many actions that put the complainant in a more unfriendly working environment: actions like moving the person from a spacious, brightly lit office to a dingy closet"). On the other hand, being shifted to an essentially equivalent job that Place did not happen to like as much does not a Title VII claim create. Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996) ("[o]therwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit"). Place's beef is that she was moved from an interesting job she liked that involved overseeing several other people to a boring job she didn't like and that lacked any supervisory duties. Some of her complaints--losing her telephone and

cubicle--are too trivial to amount to an adverse employment action. Maybe her new working quarters were not as nice, but there is no indication they were shabby or unpleasant. Being moved from one job to another also does not meet the test. There was no guarantee that Place would remain forever in the job she held before her transfer. Researching, creating, and preparing for mass production pharmaceutical products is a dynamic business that involves regularly shifting people from one job to another, as one project is completed and another is begun. Her most viable complaint is that she had diminished responsibilities. However, Place's predecessor in the job she found so dull held a higher grade level. Place could not expect to jump into a new project at the top. As she became more familiar with her new work she might have enjoyed it more and might over time have gained more responsibilities. But she only lasted a month before going on disability leave. Place did not have supervisory responsibilities in her new job, but some grade 15 positions at Abbott involve supervisory duties and others do not. Supervising other workers in one capacity did not mean that person would always have supervisory duties thereafter.

Second, even if the new position was a step down, there is no evidence that the decision to move Place was retaliatory. The sequence of events was: (1) Place and Harrington have an affair, (2) Place moves to a new position where she still works with Harrington but he no longer is her supervisor, (3) the relationship sours, (4) Harrington is a pain in the neck for Place to deal with and Place's project suffers as a result, (5) Place complains that Harrington is sexually harassing her, (6) Abbott warns Harrington, (7) Abbott creates an arrangement where Place and Harrington may interact only in the presence of a third party, (8) the project still is suffering because of the Place-Harrington friction, and (9) Abbott moves both Place and Harrington into different jobs. The fact that two people do not get along after their office romance sours is not sexual harassment, and an employer's decision to split up two workers whose interpersonal problems are impeding the company's progress is not retaliation. One view of the evidence might suggest

that Harrington was the bigger problem and Abbott might have acted unwisely and unfairly in taking Place off the project. Title VII, though, doesn't guard against unwise or unfair decisions unless those decisions also were discriminatory or retaliatory. The end of the affair led to the problems between Place and Harrington. It was those problems--not Place's complaint of sexual harassment-- that in turn led Abbott to transfer them both elsewhere.

    The judgment in favor of Ms. Place is REVERSED. The case is Remanded to the District Court for the entry of judgment in favor of Abbott Laboratories.


/1 The district court found that the post-Christmas party rendezvous was consensual. At the risk of playing the Grinch, however, we note that office Christmas parties also seem to be fertile ground for unwanted sexual overtures that lead to Title VII complaints. See, e.g., Marshall v. Cascade Utils., 1999 WL 893578, *1 (9th Cir. 1999); Pesso v. Montgomery Gen. Hosp., 1999 WL 326090, *1 (4th Cir. 1999); Bryson v. Chicago State Univ., 96 F.3d 912, 914 (7th Cir. 1996); Hennessy v. Penril Datacomm Networks, Inc., 69 F.3d 1344, 1347-48 (7th Cir. 1995); Morgan v. Massachusetts Gen. Hosp., 901 F.2d 186, 188 (1st Cir. 1990); King v. Board of Regents of the Univ. of Wis. Sys., 898 F.2d 533, 535 (7th Cir. 1990); Duchon v. Cajon Co., 1988 WL 12800, *1 (6th Cir. 1988); Jones v. Flagship Int'l, 793 F.2d 714, 716-17 (5th Cir. 1986); Afrassiabian v. ProCredit Holdings, Inc., 1999 WL 605589 (E.D. Pa. 1999); Mills v. Wex-Tex Indus., Inc., 991 F. Supp. 1370, 1377 (M.D. Ala. 1997); Simpson v. Martin, Ryan, Andrada & Lifter, 1997 WL 542701, *1 (N.D. Cal. 1997); Rivera v. City of New York, 1997 WL 539776, *1 (S.D.N.Y. 1997); Corrigan v. Labrum & Doak, 1997 WL 76524, *2 (S.D.N.Y. 1997); Alvey v. Rayovac Corp., 922 F. Supp. 1315, 1318 (W.D. Wis. 1996); Webb v. J. Merle Jones & Sons., Inc., 1995 WL 573432, *3 (N.D. Ill. 1995); Schaffer v. Ames Dep't Stores, Inc., 889 F. Supp. 41, 42 (D. Conn. 1995); Henry v. Gehl Corp., 867 F. Supp. 960, 966 (D. Kan. 1994); Richardson v. Great Plains Mfg., Inc., 1994 WL 324553, *3 (D. Kan. 1994); Johnson v. Indopco, Inc., 834 F. Supp. 1039, 1045 (N.D. Ill. 1993); Babcock v. Frank, 783 F. Supp. 800, 806-07 (S.D.N.Y. 1992); Showalter v. Allison Reed Group, Inc., 767 F. Supp. 1205, 1208, 1210 (D. R.I. 1991); Christoforou v. Ryder Truck Rental, Inc., 668 F. Supp. 294, 299 (S.D.N.Y. 1987).