Scott **PLUTA**, Plaintiff,

v.

**FORD MOTOR COMPANY**, Defendant.

No. 98 C 4290.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 25, 2000.

Eugene K. Hollander, Chicago, IL, for Plaintiff.

W. Perry Brandt, Jocelyn A. Villanueva, Charlie J. Harris, Jr., Berkowitz, Feldmiller, Stanton, Brandt, Williams & Stueve, L.L.P., Kansas City, MO,James Franklin Best, Richard Andrew Hahn, Best, Mangan, Langhenry, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Scott Pluta ("Pluta") sues his ex-employer Ford Motor Company ("Ford"), claiming that his firing by Ford violated the Americans with Disabilities Act ("ADA," 42 U.S.C. §§ 12101 to 12117).[1] Ford has moved for summary judgment, and both sides have complied with this District Court's LR 56.1.[2] Ford's motion is therefore fully briefed and ready for decision. For the reasons stated in this memorandum opinion and order, the motion is granted in part and denied in part.

### Summary Judgment Standards

Familiar Rule 56 principles impose on Ford the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n. 2 (7th Cir.1997)). As *Pipitone v. United States*, 180 F.3d 859, 861 (7th

---

1. Further ADA citations will take the form "Section—," using the Title 42 numbering rather than ADA's internal section numbers.

2. LR 56.1 is designed to facilitate the resolution of Fed.R.Civ.P. ("Rule") 56 motions by calling for evidentiary statements and responses to such statements (in each instance with record citations), thus highlighting the existence or nonexistence of factual disputes.

This opinion cites to Ford's LR 56.1(a)(3) statement as "F. St." and to Pluta's LR 56.1(b)(3)(B) statement of additional facts as "P. St. ¶—." Responses to those statement are respectively referred to as "F. Resp. ¶—" and "P. Resp. ¶—." This opinion also employs the same "F." and "P." abbreviations in referring to the parties' briefs and exhibits.

Cir.1999) has more recently quoted from *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir.1994):

> A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole.

As *McCoy v. WGN Continental Broad. Co.*, 957 F.2d 368, 370–71 (7th Cir.1992) has said, that "general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue." But neither "the mere existence of some alleged factual dispute between the parties" (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) nor the existence of "some metaphysical doubt as to the material facts" (*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) will defeat a summary judgment motion.

What follows in the *Facts* section (and in the later factual discussion) is culled from the parties' submissions. And as with every summary judgment motion, this Court accepts Pluta's version of any disputed facts where it is arguably supported by the record. Whenever any reference is made to Ford's different version on any subject, its inclusion is purely informational—Pluta's scenario is credited here even when this opinion's factual recital does not expressly say so.

### Facts

On March 13, 1994 Pluta began work at Ford's Chicago Parts and Distribution Plant as a warehouse technician (F.St.¶¶ 2, 8). Warehouse technicians perform multiple functions at three different "stations" located alongside a conveyer system. First, at the induction station "the warehouse technician sorts small automotive parts into plastic containers ('totes')[3] (*id.* ¶ 9)." Next, at the stock picking station[4] "the warehouse technician is responsible for picking individual customer orders and stocking the parts accurately into rotating stock bins and/or placing them into plastic totes" (*id.*). Finally, at the packaging station "the parts are pulled from the bins and put in boxes for individual customer orders" (*id.*). While warehouse technicians typically report to a particular station, rotations occur based on workflow and absences (*id.* ¶ 10).

On November 10, 1994 Pluta strained his back while lifting a tote at the stock picking station (F.St.¶ 11, P. St.¶ 10). He returned to work less than four weeks later (F.St.¶ 14) and says that he did not need and did not request an accommodation at that time (P. St.¶ 10). Then on June 13, 1995 Pluta picked up a 40 pound tote at the induction station and heard something pop in his back (P. St.¶ 11). After reporting to his supervisor, Pluta went to Gottlieb Memorial Hospital, where he was diagnosed with a "severe lumbar strain" (P. Resp.¶ 16). Two days later Pluta visited his personal physician, orthopedic surgeon Avi Bernstein, who prescribed time off from work and analgesics (F.St.¶ 17, P. St.¶ 12). Based on an August 25, 1995 MRI (magnetic resonance imaging) scan, Dr. Bernstein diagnosed Pluta as having a small central disc herniation at the L3/4 and L4/5 levels (P. St. ¶ 13, F.Resp.¶ 13). On November 13, 1995, after conducting further tests and considering other options, Dr. Bernstein recommended that Pluta undergo two level spinal fusion surgery (P. St.¶ 16). But a month later orthopedic surgeon Dr. Thomas Rodts counseled against surgery (F.St. ¶ 19).[5]

---

3. According to F. St. ¶ 9:

    The empty totes weigh approximately 8 pounds and the individual parts generally weigh between less than one pound to three pounds. A "full" tote contains between twenty and thirty small auto parts.

4. That station is also referred to as the "carousel area" (P. St.¶ 27).

5. Another orthopedic surgeon, Dr. Michael Kornblatt, also recommended against surgery (F.St.¶ 22).

Pluta did not return to work in 1995 except for "one or two days" between October and December (F.St.¶ 20). On one of those occasions, though, Pluta asserts that Brian Plemel ("Plemel"), an employee relations associate of Ford, refused Pluta's request to be placed on a light duty assignment such as the induction station [6] (P. St.¶¶ 19–20). Pluta also claims that Plemel told him there were no light duty positions (*id.* ¶ 21). That statement is credited for present purposes, even though Plemel denies that any such conversation took place (F.Resp.¶¶ 19–20).

Pluta says his condition today is the same as at the time of his 1995 injury (Pluta Dep. 169). He further says the injury "substantially limits" [7] his ability to perform his job primarily because of the repetitive twisting, lifting and reaching (*id.* 169–70). Dr. Bernstein believes that Pluta's injuries were an aggravation of "a preexisting condition of a degenerative disease in his low back ..." (Bernstein Dep. 15).

Dr. Bernstein saw Pluta several times over the succeeding months and ultimately requested a functional capacity evaluation, which was conducted on March 1, 1996 at Ford's expense (P. St.¶¶ 23–25, F.St.¶ 23). That evaluation stated in relevant part (F.St.¶ 23):

> Results reveal a generally deconditioned individual who demonstrated the ability to perform at the Light/Medium physical demands level. Self limiting due to pain reports which it is felt were excessive and at times inconsistent with activities being performed may comprimise [sic] the validity of this assessment as a true indicator of his maximal effort.

It went on to discuss several tests and observations that were believed to be inconsistent with the subjective pain expressed by Pluta. Because the evaluation felt that Pluta's demonstrated "ability to perform at the Light/Medium level [did] not represent[ ] true maximal effort," it recommended "[c]ounseling to address the psychological component of his reported pain and related issues ..." (F.St.¶ 23).[8]

On December 16, 1996 Dr. Bernstein recommended another functional capacity evaluation "in an effort to get an independent third-party evaluation of [Pluta's] functional ability, and to release him to restrictions based on that evaluation" (F.St.¶ 24). That second evaluation said that Pluta "gave an overall reasonable effort" and listed a few minor restrictions (F. St. Ex. C–1 at 52). One month later "independent third-party orthopedic surgeon" Dr. Julie Wehner examined Pluta and opined that he could "return to his regular job as a warehouse technician without restrictions" (F.St.¶ 25). Dr. Bernstein testified that on February 3, 1997 he told Pluta that he could return to work with reduced hours [9] and a 15 to 20 pound lifting restriction (Bernstein Dep. 21).[10]

Pluta returned to work on February 11, 1997 and was assigned to the stock picking station (P. St.¶ 27). Pluta asserts (although Ford denies—a denial this Court

---

**6.** It is disputed by the parties exactly how much twisting, bending, lifting and repetitive movement the various stations require. Unlike Ford, Pluta contends (and this opinion accepts) that the stock picking station is more strenuous than the induction station (see P. St. ¶¶ 20, 22, F. Resp. ¶¶ 20, 22).

**7.** That phrase was fed to Pluta by his attorney, and this opinion does not use that locution here to suggest that Pluta was "disabled" as defined by ADA.

**8.** Nothing in the record indicates that Pluta later received any psychological counseling.

**9.** Pluta was to begin working four-hour days and then gradually increase over time to a full day (F.St.¶ 26).

**10.** Ford denies that there was any lifting restriction, pointing to a letter and short note from Dr. Bernstein that do not mention any restrictions (F.Resp.¶ 26). But given the Rule 56 approach and the nature of the two writings, any negative inference that Ford seeks to draw from the writings' omission of a weight limit is rejected.

must now discredit) that he had asked Plemel to be "assigned to induction or as a truck driver delivering parts" (*id.*, F. Resp. ¶ 27). On that first day back Pluta re-injured his back and went to Oak Park Hospital (P. St.¶ 27). Company physician Dr. Alfred Akkeron examined Pluta the next day and concluded (F.St.¶ 28): [11]

> In light of the patient's essentially normal clinical evaluation and his functional capacity evaluation, I feel that he can return to work at this time to his regular duty position.

But Pluta contends (and this Court accepts) that Dr. Akkeron "did not listen to his complaints, and that physicians at Oak Park Hospital and Oak Park Clinic noted his disc herniation and told Pluta that he should not work until he was seen by his treating physician [that is, Dr. Bernstein]" (P. Resp.¶ 28).

On February 19, 1997 Pluta returned to work and again injured his back lifting totes at the stock picking station (P. St. ¶ 32).[12] While Dr. Akkeron determined that Pluta could return to work, Dr. Bernstein prescribed "No work" (F.St.¶ 30). On March 21, 1997 Dr. Bernstein again examined Pluta and prescribed "No work until further notice" (*id.* ¶ 31). Due to that conflict, independent physician Dr. Ronald Pawl was consulted pursuant to the collective bargaining agreement between Ford and UAW (*id.* ¶ 32).

In a July 14, 1997 letter to Plemel, Dr. Pawl opined (F. St. Ex. C–1 at 98):

> [I]t is my opinion that Mr. Pluta should not be engaged in heavy occupational activities. This is based upon the degenerative conditions in his back and not upon the work injuries in question. These injuries were both strains. There is no evidence of any acute disc herniations or anything other than degenerative changes and congenital narrowing of the spinal canal. . . .

Upon reading a job description of warehouse technician and viewing a videotape prepared by Ford, Dr. Pawl viewed Pluta's job as "only light occupational activity" and said he was "not restricted from that activity" (*id.* 98–99). Pluta, however, urges that the videotape relied upon by Dr. Pawl "did not accurately depict the day to day functions of a warehouse technician" because it did not capture repetitive tasks or lifting totes from ground level or reaching for totes above head level (P. St.¶ 31).[13]

Based on Dr. Pawl's opinion, Ford ordered Pluta to be back at work July 21, 1997 (F.St.¶ 34). Pluta showed up at work that day and was assigned to the stock picking station,[14] but he left again because

---

11. Ford contends, and Pluta acknowledges, that Pluta saw Dr. Akkeron on the day of his injury (F.St.¶ 28, P. Resp.¶ 28). But Pluta says, and Ford admits, that Dr. Akkeron examined Pluta the next day (P. St.¶ 30, F.Resp.¶ 30).

12. P. St. ¶ 32 claims that Pluta viewed that as a failure to accommodate but does not assert, nor does the record support, that on that date he asked Plemel or anyone else to be given a less strenuous assignment (though, as earlier stated, he had done so a week earlier).

13. F. Resp. ¶ 31 disputes that statement and points to a memorandum entitled "Job Analysis" prepared by Aegis, Inc., the company that also prepared the videotape (F.Resp.Ex. A). But that response does little to resolve the obvious dispute, amounting to "Pluta is wrong because Aegis is right." Significantly, F. St. ¶ 9 says that an empty tote weighs 8 pounds and a " 'full' tote contains between twenty and thirty small auto parts" which weigh "between less than one pound to three pounds." And F. Resp. ¶ 11 does not dispute that Pluta's injury on June 13, 1995 occurred when he lifted a tote weighing 40 pounds. Aegis' "Job Analysis" seems erroneously to exclude such strenuous lifting from its evaluation in stating that "[t]he warehouse technician rarely has to lift more than 1 individual part at a time ... [and] does not have to handle the totes when full of auto parts." That last statement is directly contradicted by Pluta's testimony about lifting totes filled with auto parts at the stock picking station (Pluta Dep. 93–95).

14. P. St. ¶ 52 again says that Pluta was denied an accommodation on that occasion but does not contend that Pluta affirmatively requested an accommodation at that time.

of back pain (P. St.¶ 52). On July 28, 1997, after Pluta failed to return for work, plant Human Resources Manager Bill Gough ("Gough") sent Pluta a "five-day quit" letter, stating in relevant part (F.St.¶ 39):

> Our records show that is has been five or more working days since you last worked. If you do not, within 5 working days ... from the above date, either report to the Employment Office for work or give satisfactory reason for your absence to the Employment Office in writing or by telephone, your employment will be terminated and you will lose your seniority....
>
> If you are unable to work because of illness or injury, and so report to the Employment Office within the time stated above, you will be granted a sick leave of absence to cover the period of your disability upon presenting evidence thereof.

Because Pluta did not return to work between July 28 and August 6, he was in fact terminated on that last date (F.St. ¶¶ 40–41). Meanwhile Pluta had met with Gough and Pluta's union chairman Angelo Marotta ("Marotta") on July 30 to discuss the situation (F. Resp. ¶ 58, Gough Dep. 7).[15] Pluta says that at that meeting he told Gough a medical release could not be obtained in the required time because Dr. Bernstein was out of town (P. St.¶ 58). According to Pluta, Gough responded that the opinion did not matter any more, and Gough then refused to grant Pluta any additional time to see his physician or get

---

**15.** An e-mail message from Marotta to Gough states in relevant part (P.Ex. H):

> Bill, Scott Pluta will be in on Wednesday July 30 at 9:00AM. I advised him to come in and talk to you about his medical situation. He was sent a quit notice today and this has been going on for some time now.

**16.** Though P. Resp. ¶ 36 denies that statement, the citations given do not support that denial, so the statement is deemed admitted.

**17.** Pluta's action here was initiated by his self-prepared Complaint of Employment Discrimination (self-prepared in the sense that he used the form provided by this District

---

a medical release (P. St.¶ 59). Although Gough denies stating that the opinion of Pluta's physician did not matter and denies that Pluta ever mentioned having problems getting medical documentation (F.St. ¶¶ 58–59), those denials are of course rejected for Rule 56 purposes. In any event, despite Pluta's knowledge of Dr. Pawl's findings, he did not tender any additional medical documentation before August 6 or thereafter (F.St.¶ 36).[16]

On August 18, 1997 Pluta filed a grievance with the union (P. St.¶ 64). In response Gough authored a "Company Statement of Fact and Position" that stated incorrectly that Pluta "was placed on light duty work" on July 22, 1997 (P. St.¶ 65). Gough also made an identical false statement in a letter to the EEOC (*id.* ¶ 66). Gough has no explanation for either statement (P. St.¶¶ 65–66).

### Pluta's First Three Claims Are Time–Barred

■ Pluta's first three claims are that he was not afforded reasonable accommodations in November–December 1995, January 1996 and February 1997.[17] Acknowledging that those alleged violations would normally be time-barred, Pluta seeks to advance them under the continuing violation theory.[18] In that respect *Place v. Abbott Labs.*, 215 F.3d 803, 807 (7th Cir. 2000) quotes the teaching from *Dasgupta v. University of Wis. Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir.1997):

> Court's Clerk's Office for such purposes, filling in a number of its blanks and checking a number of the boxes that are part of the form). As a result, Pluta's pleading is not framed in terms of several distinct claims. Based on the parties' current submissions, however, the characterization in the text is accurate.

**18.** Ordinarily a plaintiff is "required to file his EEOC complaint within 300 days of [his employer's] alleged discriminatory conduct" (*Huels v. Exxon Coal USA, Inc.*, 121 F.3d 1047, 1049 (7th Cir.1997)). Pluta filed his EEOC charge on February 17, 1998 (F.St. ¶ 44).

A continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period.

So, as *Wilson v. Chrysler Corp.*, 172 F.3d 500, 510 (7th Cir.1999) (quotation marks and citation omitted) explains, a "plaintiff must sue as soon as the harassment becomes sufficiently palpable that a reasonable person would realize she had a substantial claim [of discrimination]."

■ Three types of continuing violations are recognized by our Court of Appeals (*Place*, 215 F.3d at 808):

> where the exact day of the violation is difficult to pinpoint because the employer's decisionmaking process takes place over a period of time; where the employer has a systematic, openly espoused policy alleged to be discriminatory; and where the employer's discriminatory conduct is so covert that its discriminatory character is not immediately apparent.

Only the last of those alternatives would arguably apply to Pluta's assertions. But Pluta testified that there was "no doubt" in his mind that Ford had failed to accommodate him on each of those three occasions (Pluta Dep. 60). Because by his own acknowledgment his knowledge called for the filing of a charge under those circum-

stances,[19] all of Pluta's claims relating to events more than 300 days before February 17, 1998 are dismissed.[20]

*Pluta's Wrongful Termination Claim* [21]

Under ADA's employment section (Title I), "a covered entity may discriminate in two ways: disparate treatment of or failure to accommodate a disabled employee" (*Stevens v. Illinois Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir.2000)). Those two types of claims involve two distinct lines of analysis, with the failure to accommodate analysis not employing the familiar *McDonnell Douglas* burden-shifting framework because it "is unnecessary and inappropriate. Accordingly, it is important for the plaintiff to be clear about the nature of the claim he or she is asserting" *Weigel v. Target Stores*, 122 F.3d 461, 464 (7th Cir.1997) (citations and internal quotation marks omitted).

■ *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1032 (7th Cir.1999) (citations omitted) describes a plaintiff's required showing [22] under the failure to accommodate analysis:

> (1) she was or is disabled; (2) the defendant was aware of her disability; (3) she was otherwise qualified for her job; and (4) the disability caused the adverse employment action (a factor which is implied if not stated).

**19.** As F.R. Mem. 4 points out, because Pluta claims that he could not perform the stock picking function after his June 13, 1995 injury, "it strains credulity to think that Pluta, did not believe Ford was 'harming' him or engaging in discriminatory conduct when Ford assigned him to the stock pick functions in February 1997...."

**20.** As always, the dismissal of a claim as time-barred does not preclude admissibility of the evidence regarding the charged conduct if it is relevant to such issues as, for example, the employer's claimed discriminatory intent.

**21.** There is no dispute that Pluta's employment was terminated within the requisite 300 days before his EEOC charge.

**22.** In the summary judgment context, of course, Pluta's burden is only that of creating reasonable inferences, not one of proof as such (see *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir.1994)). But any continued repetition of that burden involves an awkward locution, an awkwardness contributed to by the fact that so much of the case law speaks of what an employee must "prove" or "show." Accordingly, whenever this opinion employs such terms it should be understood as meaning Pluta's lesser burden of creating reasonable inferences, not his actually bearing the burden of persuasion. That inference-creating burden is the test that this Court has in fact used throughout this opinion.

And as for the disparate treatment approach,[23] *Gorbitz v. Corvilla, Inc.,* 196 F.3d 879, 882 (7th Cir.1999) (adapted to this case) says that Pluta must first show:

> (1) [he] was disabled; (2)[his] work performance met [Ford's] legitimate expectations; (3)[he] was terminated; and (4) the circumstances surrounding [his] termination indicate that it is more likely than not that [his] disability was the reason for the termination.

If Pluta establishes a prima facie case in those terms, the *McDonnell Douglas* burden-shifting analysis comes into play.

Here Pluta's self-prepared complaint was a layman's effort, so it was understandably imprecise as to his theory of recovery. And his appointed counsel's Rule 56 submissions have spoken in terms of both failure to accommodate and a discriminatory adverse employment decision. This opinion will accordingly examine Pluta's wrongful termination claim from both perspectives.

■ Because each approach implicates Pluta's ability to do the required work (understandably, given ADA's Section 12112(a) prohibition against discriminating against "a qualified individual with a disability ..."), that question will be addressed first. On that score Ford argues that Pluta was not qualified to perform the essential job functions [24] because he reported to work for only seven days between June 13, 1995 and August 6, 1997. But Ford shoots itself in the foot by labeling these facts as "uncontroverted" (F.R. Mem. 12, record citations omitted):

> Because of the differences of opinion between Pluta's personal physician and other treating physicians, pursuant to

the COLLECTIVE BARGAINING AGREEMENT, Ford arranged for Pluta to see [Dr. Pawl]. After Dr. Pawl opined that he could return to his job without restrictions, Pluta reported to his workstation on July 21, 1997.

That statement certainly evidences no concern on Ford's part as to Pluta's ability to do his job, and it is wholly consistent with Pluta's view that he was on "conditional medical leave" (P. Mem.12).

There is no question that Ford was highly accommodating in granting Pluta medical leave and providing for an independent medical examination. But the only evidence as to a problem being indicated by Pluta's absences was Ford's ultimate issuance of the five-day quit letter.[25] And its thrust was one of seeking to separate voluntary absences on goldbricking from legitimate medical problems, rather than of disputing Pluta's qualification to do the job.

This situation, with the necessary reasonable inferences in Pluta's favor, undermines Ford's reliance on *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.,* 201 F.3d 894, 899–900 (7th Cir.2000), *Waggoner v. Olin Corp.,* 169 F.3d 481, 483–85 (7th Cir.1999), *Corder v. Lucent Techs. Inc.,* 162 F.3d 924, 926–28 (7th Cir.1998) and *Nowak v. St. Rita High Sch.,* 142 F.3d 999, 1001, 1003 (7th Cir.1998). Things would be different if Ford had made available to Pluta a light duty assignment, like the one evidently envisioned by Gough (an assignment for which Pluta was indisputably qualified), while the differing medical opinions were being resolved, and if Pluta had then refused that offer. In sum, for

---

**23.** In terms of disparateness of the treatment accorded to Pluta, P. St. ¶¶ 40–45 set out undisputed evidence that other plant employees were given less demanding assignments because of injuries, while his like requests were rejected.

**24.** Pluta responds that in all events he is a "qualified individual" for light duty assignments.

**25.** F. Mem. 7–8 argues that such logic penalizes Ford "for having a liberal leave of absence policy." But that argument ignores the illiberality of giving a very short first and final warning time to an employee who has availed himself of that policy, then refusing to give the employee a bit of added time needed to get word from his doctor to comply with the warning's directive.

purposes of the current motion Pluta (despite his extended absences) has satisfied the element of his being a "qualified individual" under ADA.

But was Pluta otherwise "disabled"? Significantly, Ford does not argue in its current motion that he was not. Indeed, if as Pluta posits the videotape relied upon by Dr. Pawl is inaccurate and a warehouse technician's activities are more properly characterized as heavy activity, Pluta's injury would plainly be a disability under ADA (see *DePaoli v. Abbott Labs.*, 140 F.3d 668, 672–73 (7th Cir.1998)). For present purposes, then, Pluta must be viewed as "disabled."

■ What remains under the failure to accommodate approach is whether there was a causal nexus between that disability and Ford's adverse employment action, while the ultimate remaining inquiry if the *McDonnell Douglas* route were taken is whether Ford's stated reason for its action was pretextual.[26] Either way, then, the inquiry turns to the real cause for Pluta's termination.

In view of all the surrounding circumstances, there is a genuine factual issue as to whether Pluta's disability was the reason for the termination. In evidentiary terms, as *Conley v. Village of Bedford Park*, 215 F.3d 703, 709 (7th Cir.2000) has said, quoting from *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 735 (7th Cir.1994):

> Different kinds and combinations of evidence can demonstrate a discriminatory intent such as "suspicious timing, ambiguous statements, oral or written, behav-

ior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn."

So Pluta's asserted non-compliance with the five-day quit letter, which Ford puts forth as the reason for his termination, cannot be viewed in a vacuum. Instead, a variety of factors indicates that a genuine and material issue of fact exists as to whether Ford's reason for issuing and then acting immediately on that letter was pretextual.

There is clearly a dispute as to whether Pluta asked Plemel for a light duty assignment and was rebuffed.[27] Indeed, despite the fact that Ford admirably condoned Pluta's prolonged absences because of his back problems, only Gough's fictitious statements refer to the nonexistent light duty assignments given to Pluta. And Gough's misstatements on that score also confirm that light duty positions could have been found for Pluta at the plant—it is undisputed that other employees at the plant were assigned less physically demanding tasks because of injuries (P. St. ¶¶ 40–45). As for Dr. Pawl's medical opinion, it rests on a presently impermissible Ford-favoring resolution of disputed facts: If as Pluta says the Aegis report and the videotape that Dr. Pawl relied on are inaccurate, his recommendation of returning to the "light" activity of a warehouse technician without restrictions is meaningless. And again Gough's misstatements demonstrate that he felt some activities existed that were "lighter" than the day-to-day work of a warehouse technician.[28] In sum,

26. This similarity of issues provides another illustration of the often-repeated point that the *McDonnell-Douglas* burden-shifting framework is not an ironclad formula, but merely an "organizational structure for [a court] to assess the need for a full trial" (*Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1090 (7th Cir.2000)).

27. Though that dispute clearly relates to the time-barred claims, it is also relevant as a factor in the "all of the circumstances" analysis.

28. Obviously the light duty work envisioned by Gough in his two "misstatements" is not the same purportedly "light occupational activity" shown as the day-to-day work of a warehouse technician on the videotape.

if Pluta had requested a reasonable accommodation and was refused even though light-duty positions were available, and if the report and video relied upon by Dr. Pawl is misleading, then Ford's demand in the five-day quit letter that Pluta return to his prior activities or face termination is nothing more than a thinly disguised effort to rid Ford of Pluta for other reasons.[29]

Combined with those factors is Pluta's claimed need for more time to get additional medical documentation. Even if the five-day quit letter were taken at face value, Pluta testified that Gough did not care when Pluta said that he was unable to get further medical documentation because his physician was out of town.[30] That testimony, which must be credited for now, casts further suspicion on Ford's asserted motivations.[31] After all, Ford had the options of offering Pluta a less strenuous job or of waiting until Dr. Bernstein was back in town to provide further medical documentation, but it did neither. Those facts stand in sharp contrast to the cases relied upon by Ford at F. Mem. 8.[32] Pluta thus succeeds in showing that "the circumstances surrounding his termination" indi-

cate that Ford's asserted reason for terminating him was pretextual.[33]

### Conclusion

Pluta's non-termination ADA claims are all time-barred and are dismissed with prejudice. As to Pluta's wrongful termination claim under ADA, however, Ford has not succeeded in demonstrating the absence of genuine issues of material fact that, if resolved in Pluta's favor, keep that claim alive. Ford's Rule 56 motion as to that claim is therefore denied. This action is set for a telephonic status hearing at 8:45 a.m. September 1, 2000 to discuss the necessary procedures to bring the case to trial.

---

29. Pluta speculates that Ford's real motivation in terminating his employment was to get rid of an employee who "was repeatedly injured and filed claims with the Illinois Industrial Commission" (P. Mem.13).

30. F.R. Mem. 14 (emphasis added) seeks to undermine Pluta's testimony by saying that Pluta must put forth *"independent* evidence showing that Ford's motive's [sic] are not believable...." But that is directly at odds with last Term's Supreme Court decision in *Reeves v. Sanderson Plumbing Prods., Inc.,* —— U.S. ——, 120 S.Ct. 2097, 2108–09, 147 L.Ed.2d 105 (2000). Indeed, that unanimous decision casts a major cloud over such Seventh Circuit decisions as *Russell v. Acme-Evans Co.,* 51 F.3d 64, 68 (7th Cir.1995), on which Ford seeks to rely.

31. While F.R. Mem. 14 suggests that Pluta should have gone to someone other than Dr. Bernstein to provide some medical documentation in the required time period, such a contention is unfair given the five days in

which Pluta had to respond. In fact, advancing such a post hoc contention itself impairs Ford's credibility.

32. Those cases are *Magiera v. Ford Motor Co.,* No. 97 C 421, 1998 WL 704061, at *6 (N.D.Ill. Sept. 30), where plaintiff was offered another job as well as having no excuse for not complying with a five-day quit letter and *Thomas–Hollis v. Armour Swift Eckrich, Inc.,* No. 95 C 6463, 1998 WL 42324 (N.D.Ill. Jan. 28), where after the employer learned that three physicians had released plaintiff for work, plaintiff offered no reasons as to why she could not substantiate further medical absences. And those distinctions apart, we are regularly reminded that the decisions of District Judges (either this Court's or those of its colleagues) are not precedential in nature.

33. To put it another way, construing the facts in Pluta's favor reveals "that it is more likely than not that [Pluta's] disability was the reason for the termination" (*Gorbitz,* 196 F.3d at 882).