In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 17-1278

ROSEMARY MADLOCK,

*Plaintiff-Appellant,*

*v.*

WEC ENERGY GROUP, INC.,
d/b/a WE ENERGIES,

*Defendant-Appellee.*

———————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:16-cv-00332-JPS — **J.P. Stadtmueller**, *Judge.*

———————

ARGUED NOVEMBER 1, 2017 — DECIDED MARCH 14, 2018

———————

Before MANION, KANNE, AND ROVNER, *Circuit Judges.*

MANION, *Circuit Judge.* Rosemary Madlock has worked for Wisconsin Electric Power Company ("WEPCO")[1] for ap-

———————

[1] The caption of the case identifies the defendant-appellee as "WEC Energy Group, Inc. d/b/a We Energies." However, according to the disclosure statement in its brief, the defendant-appellee is properly identi-

proximately forty years. In 2016, she brought this § 1981 suit against WEPCO after she was transferred from one section of WEPCO's billing division to another, a move she claims was the result of racial discrimination. She also claims WEPCO retaliated against her by disciplining her after she filed an internal discrimination complaint against her former supervisor.

The district court granted summary judgment to WEPCO, and Madlock now appeals. Because there is no genuine dispute about any material fact and WEPCO is entitled to judgment as a matter of law, we affirm the judgment of the district court.

## I.

This is an appeal from the grant of summary judgment, so we "view the evidence in the light most favorable to the nonmoving party," *Foskett v. Great Wolf Resorts, Inc.*, 518 F.3d 518, 522 (7th Cir. 2008), and "draw all reasonable inferences from the evidence" in her favor, *Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005) (quoting *Franklin v. City of Evanston*, 384 F.3d 838, 843 (7th Cir. 2004)).

Madlock, who describes herself as a "confident and knowledgeable African American woman," has worked at WEPCO since 1977. In the mid-1990s, Madlock began working in the "Meter to Bill" division of WEPCO, which was responsible for handling WEPCO's billing. Meter to Bill was split into two sections: Industrial Billing, which served WEPCO's large commercial customers, and Volume Billing,

---

fied as "WEPCO." WEC Energy Group, Inc., is WEPCO's parent corporation.

which served smaller commercial and residential customers. At the time of the events involved in this action, Madlock was working as a Lead Customer Service Specialist in the Industrial Billing section. As a "Lead," Madlock was not in management, but she was expected to be a point person for her team of "billers."

In 2011, WEPCO assigned a new management team to Meter to Bill, and Renee Rabiego-Tiller assumed the position of Manager. This new management team came in with a mandate to perform a comprehensive review of Meter to Bill to reduce rebills. As part of this focus, management instituted various metrics to measure performance.

Jean Frelka, the Director of Meter to Bill, hired Cathy Wrycza, a white woman, to be a "Team Leader" in the Industrial Billing section, meaning that Wrycza became Madlock's direct supervisor. From very early on, Wrycza and Madlock butted heads. Wrycza, who had come from WEPCO's Call Center, was unfamiliar with certain aspects of her new post. Due to her lack of experience, Wrycza would approach Madlock with questions, but these sessions would not go well, and Wrycza would storm away. At some point, Wrycza admitted to Madlock that she had problems dealing with Madlock's stature, which Madlock took as a reference to her height and her demeanor in conversation.

Even before the new management team arrived in Meter to Bill, Madlock's conduct, such as personal phone use, had drawn the attention of management, and under Wrycza and the rest of the new management team, Madlock's conduct came under even greater scrutiny. In December 2011, Wrycza learned of a billing error Madlock had made the preceding June. In February 2012, Wrycza gave Madlock an

official written "coaching,"[2] which constituted the first step on WEPCO's graduated discipline system, for that error. Madlock filed a grievance against that discipline, but Tiller ultimately denied the grievance, noting Madlock had committed another error on a different account. In May 2012, Wrycza issued Madlock a "Record of Disciplinary Action," the second step in the discipline system, because Madlock had approved a bill that overbilled a customer by $58,900. In August 2012, Frelka rescinded the February discipline, concluding that Madlock had not received the requisite training at the time she committed the error. This downgraded the discipline for the $58,900 overbill to a first-step official coaching. In November 2012, Frelka instructed Wrycza to discipline Madlock for inappropriate behavior and the use of unprofessional language due to an incident with two co-workers. Madlock filed a grievance against that discipline, which Wrycza denied.

By February 2013, the conflict between Wrycza and Madlock was apparently coming to a head. The two met with Tiller, who told them to communicate. A month later, Tiller decided to transfer Madlock out of Industrial Billing into Volume Billing. Tiller cited Madlock's billing errors as the reason for the move. Because Volume Billing handled smaller accounts, the magnitude of any future errors would be mitigated.

---

[2] From the record, it appears the term "coaching" is used in two different ways at WEPCO. A "coaching" can be an official disciplinary action, otherwise referred to as a "written counseling," or it can be an informal instruction given to a wayward employee. To differentiate between these two uses, this opinion will refer to the former as "official coachings" and the latter as "unofficial coachings."

As a result of the transfer, Madlock was moved to a cubicle in the center of the room between two managers, and her team from Industrial Billing was told to no longer go to her for help. Though WEPCO did not initially give her a new team in Volume Billing, this was due to Madlock's unfamiliarity with Volume Billing's processes. The transfer did not affect Madlock's title or salary, but one co-worker described the transfer as a demotion and another referred to it as a total humiliation. Tiller herself wondered whether the move humiliated Madlock.

In Volume Billing, Madlock's new supervisor was Shemieka Phillips, a black woman. At some point (Phillips cannot remember when), Wrycza discussed her insecurities about Madlock with Phillips, and Wrycza expressed her view that Madlock was a "strong black woman." Wrycza had also used this phrase in 2008 or 2009 in a conversation with a union steward at a dinner, asking her how she dealt with "strong black women."

On April 12, 2013, after prompting by Phillips, Madlock filed an internal discrimination complaint against Wrycza, alleging Wrycza discriminated against her on the bases of age and race. Reacting to the complaint, WEPCO's investigator interviewed several people, including Phillips and Wrycza. Wrycza learned of the complaint on May 14, 2013, the day of her interview.

On April 4, 2013, before Madlock filed her complaint, a company trainer reported to Tiller that Madlock had made a billing error in August 2012 that resulted in a $10,000 credit back to the customer. On May 16, 2013—two days after Wrycza learned of the complaint—Phillips, after consultation with Tiller, issued Madlock a Record of Disciplinary Ac-

tion for that error. On May 30, 2013, Madlock filed a grievance challenging the discipline.

In response to the grievance, Phillips set out, with Wrycza's assistance, to compile a list of Madlock's prior unofficial coachings and disciplines. The resulting list, composed by reference to Madlock's personnel file, contained a notation for every time a supervisor had discussed an issue with Madlock, whether it was an official disciplinary action or not. On June 6, 2013, Phillips denied Madlock's grievance. On November 21, 2013, the Vice President of Customer Service also denied the grievance, expressing shock at the number of errors Madlock had committed.

In December 2013, a Claims Analyst position opened at WEPCO, and Madlock applied. This position would have been a "promotion" for Madlock. On January 24, 2014, Madlock was notified that WEPCO was not offering her the position due to her work record. Madlock filed a grievance on this non-selection, which was denied.

Madlock then filed the instant § 1981 suit, alleging that WEPCO discriminated against her due to her race and retaliated against her for filing the internal discrimination complaint. WEPCO moved for summary judgment. The district court granted summary judgment to WEPCO. Madlock appealed.

## II.

Our review of the grant of a motion for summary judgment is *de novo*, and we may affirm such a grant "for any reason supported by the record." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any ma-

terial fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Considering that summary judgment may only be denied when there is a "genuine dispute" as to a "material fact," we are not tasked with determining whether there is *any* evidence in the record to support the non-movant, but rather "whether reasonable jurors could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Lynch v. Belden and Co., Inc.*, 882 F.2d 262, 269 (7th Cir. 1989) (stating that the plaintiff in a discrimination suit bears the burden of proof by the preponderance of the evidence). In this case, Madlock makes claims of racial discrimination and retaliation. We address each in turn.

### A. Racial Discrimination

We recently cleaned out "the rat's nest of surplus tests" that plagued our case law on the subject of race discrimination. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016) (internal quotation marks omitted). In their place, we now employ the following straightforward inquiry: "[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765. This test presupposes the existence of an adverse employment action, so the threshold issue we must resolve is whether such an action has even occurred.

An adverse employment action is "some quantitative or qualitative change in the terms or conditions of [the plaintiff's] employment that is more than a mere subjective preference." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901

(7th Cir. 2003). "Such changes can involve the [plaintiff's] current wealth, his career prospects, or changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Boss*, 816 F.3d at 917. However, "not everything that makes an employee unhappy is an actionable adverse action." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (quoting *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004)). In that vein, we have held that "[a] transfer involving no reduction in pay and no more than a minor change in working conditions will not do." *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996).

Here, Madlock's transfer to Volume Billing occasioned no reduction in salary, loss of benefits, nor even a loss of title. But the transfer did cause Madlock to lose the team of billers for whom she served as "lead," and that team was told no longer to approach Madlock with questions. Additionally, Madlock was assigned a cubicle in the middle of the room between two managers. And she has presented testimony that her co-workers, and even management, viewed this move as a demotion and a humiliation.

A nominally lateral transfer that "significantly reduces the employee's career prospects by preventing her from using her skills and experience" can be an adverse employment action. *See Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1069 (7th Cir. 2012) (quoting *Nichols*, 510 F.3d at 780)). So can isolation or a similar "alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet." *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002). Madlock believes that the loss of her team constituted

a significant diminishment in her responsibilities, and management's instruction that her team was no longer to approach her with questions, combined with her assignment to a cubicle between two managers, constituted humiliating and isolating changes to her work conditions equivalent to being placed in a closet. We disagree.

It is undeniable that Madlock losing her Industrial Billing team when she was transferred was a diminishment of her responsibilities. But the evidence shows that leaving Madlock without a team was not intended to be a permanent situation. Instead, Madlock required time to adjust to the situation in Volume Billing. The temporary loss of a leadership role does not constitute an adverse employment action. *Cf. Place v. Abbott Labs.*, 215 F.3d 803, 810 (7th Cir. 2000) (concluding that the plaintiff "could not expect to jump into a new project at the top").

Additionally, Madlock's claim that she has been practically placed in a closet is hyperbolic. Her dislike for her new cubicle location reflects a purely subjective preference. *See id.* (noting the plaintiff made no allegation her new working quarters "were shabby or unpleasant"). Indeed, it is possible her placement between two managers could objectively be viewed as a suggestion that she herself is a person with authority. Her claim that she is isolated from her former team is likewise an exaggeration—her former Industrial Billing team was only told not to go to her with questions, not to avoid her entirely as if she were anathema.

Madlock's most compelling evidence is that some of her co-workers, and even Tiller, found her transfer humiliating or the equivalent of a demotion. However, even that does not make the transfer an adverse employment action. Some

people thinking an action is "humiliating" is not enough, on its own, to raise the action to the level of an adverse employment action. For example, in *Spring v. Sheboygan Area School District*, 865 F.2d 883 (7th Cir. 1989), the plaintiff, the principal of an elementary school, alleged that her reassignment as dual principal of two elementary schools was an adverse employment action in part because "the public perceived the transfer as a 'nudge toward retirement.'" *Id.* at 886. We rejected that argument, noting that "public perceptions were not a term or condition of [the plaintiff's] employment." *Id.*

The same rationale applies here. Madlock's co-workers and Tiller may have viewed the transfer as a demotion or a humiliation, but their opinions about Madlock's work situation are not a term of Madlock's employment. Whether an action is adverse requires an amount of objectivity, "[o]therwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Williams*, 85 F.3d at 274. Here, the transfer effected no material change in Madlock's employment, and thus it was not an adverse employment action. Because Madlock has not shown an adverse employment action, summary judgment is appropriate on Madlock's discrimination claim.

## B. Retaliation

To succeed on a retaliation claim, a plaintiff can take a "direct" approach and "show that (1) he engaged in protected activity; (2) he suffered a materially adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Boss*, 816 F.3d at 918. Alternatively, a plaintiff may take an "indirect" approach, by

which he "must show that (1) he engaged in protected activity; (2) he suffered a materially adverse employment action; (3) he was meeting his employer's legitimate expectations; and (4) he was treated less favorably than similarly-situated employees who did not engage in protected activity." *Id.* If the plaintiff makes that showing, "the burden shifts to the employer to articulate some legitimate, nonretaliatory reason for its action," which it is then up to the plaintiff to expose as pretext. *Id.*

The primary basis of Madlock's claim for retaliation is the discipline she received on May 16, 2013, for the billing error she had made the previous August. This discipline, she argues, harmed her chances of receiving a promotion to the Claims Analyst position.[3] She also claims that the creation of the list of informal coachings and official disciplines was an adverse action in retaliation for her filing of her internal complaint. She argues that the list was intended to uphold the May 16 discipline through WEPCO's internal grievance process and was "peppered" with inaccuracies, exposing the nefarious intent with which it was assembled. Even assuming these constitute adverse employment actions, Madlock has failed to make a showing of retaliation under either the direct or indirect approach.

Under the indirect approach, Madlock's claim fails because she does not identify a sufficient comparator. Madlock argues that management did not discipline anyone else for

---

[3] Madlock does not argue that her actual non-selection for the position was in retaliation for the filing of her complaint, as there is no evidence that the person who made the hiring decision was even aware of the complaint.

an error that occurred many months earlier, but Madlock identifies no specific person who committed an error many months before management learned of the error. She does not account for the fact that management only discovered her error a month before imposing the punishment, or the fact that it was a $10,000 mistake. Concerning the list of unofficial coachings and disciplines, Madlock argues that Wrycza did not even submit a rating form when another employee whom she had disciplined applied for a promotion. This argument is unavailing. By Madlock's own admission, Wrycza and Phillips compiled the list of coachings and disciplines in response to Madlock's filing of a grievance against the May 16 discipline, not in anticipation of Madlock applying for a promotion, so the situations are not similar enough to show that Madlock and the other employee are "directly comparable … in all material respects." *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). Consequently, that Wrycza did not compile a list or submit a rating form when another employee applied for a promotion does not show differential treatment.

Under the direct method, Madlock fails to show a causal link between the filing of her complaint and her receipt of the discipline or the compilation of the list. Madlock does show temporal proximity—she was disciplined two days after Wrycza learned of her complaint and the list was compiled shortly thereafter—but "timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007). She has no other evidence suggesting that anyone in management ever responded negatively to her filing of the complaint or took any steps against her because of

it. On the contrary, the evidence shows that Phillips, the supervisor who actually imposed the discipline on Madlock and assisted in the creation of the list, encouraged her to file the complaint.

Madlock attempts to overcome this evidentiary gap by arguing that the notations in the list of coachings and disciplines prepared by Wrycza and Phillips are inaccurate, and that Wrycza and Phillips knew the list was inaccurate when they made it, showing their malevolent design. She claims they included events that never happened, sprinkling them through the list in what she refers to as "false peppering." A look into the record shows that this argument is misleading. Madlock supports her allegation of falsity with a citation to a portion of Phillips's deposition. In the deposition, Phillips acknowledges, when asked about potential issues with the dates listed for some of the events in the list, that some of the information in the list may be incorrect. Nevertheless, she affirms that everything in the list is supported by records in Madlock's human resources file. Given Phillips's uncontested assertion that she and Wrycza relied on Madlock's human resources file, Madlock can claim that the file is incorrect and the listed events did not take place. That said, she still has no evidence to support an allegation that management *knowingly* falsified the list in response to her discrimination complaint. As long as management genuinely believed in the correctness of the human resources file, this is not evidence of retaliatory intent. Absent such evidence, we decline to infer a retaliatory motive. Because Madlock cannot show a sufficient causal link between the filing of her internal complaint and the alleged adverse actions, her claim for retaliation must fail.

### III.

For the foregoing reasons, we conclude Madlock has not presented sufficient evidence to create a genuine issue of material fact concerning either her race discrimination claim or her retaliation claim, and WEPCO is entitled to judgment as a matter of law. Accordingly, we AFFIRM.