In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 24-1567

STELLA PATERAKOS,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO and CRYSTAL WARREN,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cv-00052 — **Sara L. Ellis**, *Judge*.

———————————

ARGUED JANUARY 17, 2025 — DECIDED AUGUST 12, 2025

———————————

Before SYKES, *Chief Judge*, and HAMILTON and PRYOR,
*Circuit Judges*.

HAMILTON, *Circuit Judge*. In 2020, plaintiff Stella Paterakos, a white woman, was working as an Assistant Community Living Specialist (ACLS) for the Chicago city government. Before March of that year, Paterakos had never been disciplined. That changed after defendant Crystal Warren, a black woman, became her supervisor. Warren was brought in to improve the performance of all the ACLSs, who had been

consistently underperforming. Over the course of seven months, Warren recommended that Paterakos be disciplined three times, resulting in one-, three-, and five-day suspensions under the city's progressive discipline policy. For each suspension, management cited performance issues related to office policies, work assignments, or leave under the Family and Medical Leave Act (FMLA). Although Paterakos substantially admitted to the conduct identified as the basis for each suspension, she believes that Warren singled her out for harsh treatment.

Paterakos sued the City of Chicago and Warren, claiming that all three suspensions were based on her race and age and that the third suspension also interfered with or was retaliation for her taking FMLA leave. Defendants moved for summary judgment. The district court granted the motion on all claims. Paterakos has dropped her claim of age discrimination, but she argues on appeal that the district court erred by granting summary judgment under the Civil Rights Act of 1964, the Equal Protection Clause of the Fourteenth Amendment, and the FMLA.

We affirm. No reasonable jury could find that defendants suspended Paterakos because of her race rather than because of the cited problems with her performance. For the FMLA-related suspension, the undisputed facts also show that defendants believed honestly, even if mistakenly, that Paterakos was abusing her FMLA leave. Their honest belief defeats her claims for interference and retaliation under the FMLA.

I.  *Factual Background*

Plaintiff Stella Paterakos is white and began working in 2012 for Chicago's Department of Family and Support

Services (DFSS) as an Assistant Community Living Specialist. The majority of DFSS employees are black. In 2020, Paterakos was one of approximately 14 ACLSs assigned to work in a call center located in Room 100 of city hall. Her essential duties included providing counseling, information, referrals, and assistance to adults with disabilities, older adults, and their families regarding social services.

Paterakos's claims arose during the COVID-19 pandemic. The Room 100 ACLSs remained onsite throughout the pandemic because they performed essential duties such as linking seniors and disabled adults to services. In early 2020, they reported to Erica Pulphus, a black employee who had been supervising the Room 100 ACLSs since 2006. Pulphus did not discipline employees, but she did report problematic behavior to her supervisor, defendant Crystal Warren. Warren, who is black, became the Regional Director of Room 100 on March 20, 2020. Warren was assigned the specific goal of reducing the rate at which Room 100 ACLSs dropped incoming calls from clients. Deputy Commissioner Monica Rafac, a white employee, oversaw the Human Resources Division.

After taking over Room 100, Warren initiated discipline against Paterakos three times, leading to one-, three-, and five-day suspensions. Paterakos contends that all three suspensions, as well as a one-week assignment to a different office, were racially motivated. She also contends that the third suspension interfered with or retaliated for her taking FMLA leave. We summarize next the events that gave rise to each suspension and the one-week assignment. Because we are reviewing a grant of summary judgment, we give Paterakos as the non-moving party the benefit of conflicts in the evidence

and reasonable inferences that could be drawn from that evidence.

A. *First Suspension*

The first suspension arose out of incidents that took place during Warren's first month of supervising the Room 100 ACLSs. One group of incidents concerned Warren's efforts to reduce the rate at which ACLSs dropped client calls. To prevent client calls from being routed to unavailable ACLSs and then dropped, ACLSs were supposed to put their work phones in "not-ready" status if they were unavailable to take calls. In her deposition, Paterakos testified that she sometimes forgot to put her phone in not-ready status. Pulphus testified that between March 2020 and February 2021, Paterakos failed to leave her phone in not-ready status as many as five times a day and more often than any other Room 100 ACLS.

Other incidents arose out of Paterakos's failure to comply with Room 100's lunch and break policies. Room 100 ACLSs had a one-hour lunch break and two 15-minute breaks each day. All ACLSs were assigned to take lunch at either noon or 1:00 p.m. and were expected to inform a supervisor if they took lunch at a different time. Pulphus instructed the ACLSs to inform her if a call with a client went into their lunch hours so that she could assist. During March and April 2020, Paterakos failed to inform a supervisor before taking her lunch at a time other than her assigned time on at least two occasions. One of those incidents occurred just two days after Pulphus spoke to Paterakos about taking her lunch at noon as scheduled.

Regarding breaks, Warren and Pulphus testified that all ACLSs were expected to notify a supervisor before taking a

break. Paterakos believes she was the only ACLS who was required to ask permission before taking a break, but another white ACLS testified that the requirement was "general knowledge." Pulphus testified that she frequently reported Paterakos to Warren for not being at her desk when she should have been or for being gone for extended periods of time. In a March 26 email, Warren reported that on March 23 and 26, she had observed Paterakos leave the office without notifying a supervisor. Warren also wrote a memo on April 8 saying that Paterakos took an unauthorized break on March 31. On April 16, Warren wrote her supervisors that Paterakos was continuing to leave her phone in ready mode when leaving her desk, to take breaks without notifying a supervisor, and to begin working after her scheduled start time. Warren asked for help, writing "Every day it is the same behavior."

On April 20, Paterakos received a notice of pre-disciplinary investigation charging her with being absent without leave on April 16, leaving her workstation with the phone in ready mode, and using the office copy and fax machines for functions not related to her job duties. She was also charged with failing to return to work on time after breaks, failing to follow the lunch schedule, and leaving the building without asking for a break. In her response to the charges, Paterakos admitted that she left her desk on April 16 without putting her phone in not-ready status pursuant to office policy and used the fax machine for personal reasons. After a pre-disciplinary meeting with Warren and a union representative, Paterakos was disciplined with a one-day suspension.

B. *Second Suspension*

The second suspension arose during the first week of June 2020 when the Room 100 call center was closed due to civil unrest. ACLSs were notified by phone and email that they should check their emails hourly regarding remote work assignments. On June 3, Warren sent an email to the Room 100 ACLSs with an access code for a webinar presented by a delegate agency. Paterakos informed Warren via email that she had already attended the same webinar on May 27, with Pulphus's permission. Warren told Paterakos that the webinar was nevertheless mandatory for all staff. Another black employee told Warren that she had already attended the webinar and received the same response. Paterakos logged onto the webinar when there were only five or ten minutes left. She was the only employee not on vacation who failed to attend the entire webinar.

On June 26, Paterakos was issued a second notice of pre-disciplinary investigation charging her with violating various personnel rules during the week of June 1. At a pre-disciplinary hearing, Paterakos admitted that she failed to respond to requests to keep in touch with Warren and to attend the webinar. On June 26, she received a three-day suspension.

C. *Third Suspension*

The third suspension involved Paterakos's FMLA leave. In 2020, Paterakos requested FMLA leave to care for her father by assisting him with medical appointments, medication management, and activities of daily living. She was approved to take intermittent FMLA leave, which could be used in 15-minute increments.

Paterakos took FMLA leave on the mornings of July 20, 21, 23, 24 and 28. On each morning, Warren and Pulphus observed Paterakos on her cell phone and talking to the police officers on duty around city hall. They believed that Paterakos was abusing her FMLA leave.

On August 18, Paterakos received a third notice of predisciplinary investigation. The notice listed various times on July 20, 21, 23, 24 and 28 that Pulphus or Warren observed Paterakos socializing or talking on her cell phone around city hall. It also noted that Paterakos swiped in late on July 21 and 23 when returning from FMLA leave. On September 9, she received a five-day suspension. Paterakos continued to take FMLA leave in 2020 after her suspension. In 2021, she applied and was approved for intermittent FMLA leave to care for her father.

D.  *Assignment to the DePaul Center*

In April 2020, the city opened temporarily a second call center at the DePaul Center in downtown Chicago to give ACLSs more room for social distancing. Human resources director Rafac decided whom to send to the DePaul Center. On April 2, Rafac emailed Paterakos and nine other ACLSs telling them to report to the DePaul Center on April 6 at 9:00 a.m. for a minimum of one week. Paterakos responded that she did not want to be assigned to the DePaul Center and that the assignment violated the collective bargaining agreement. The union grieved the assignment, and after the first week, assignments to the DePaul Center were made according to seniority. Nonetheless, Paterakos reported to the DePaul Center from April 6 to April 13. Neither Paterakos's pay nor her responsibilities changed during that one-week assignment to the DePaul Center.

II. *Procedural History*

After the third suspension, Paterakos filed this employment discrimination suit against the city of Chicago and Warren. She alleged that the city violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1), by suspending her and transferring her to the DePaul Center. She also alleged that the third suspension constituted unlawful retaliation and interference in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2615(a)(1) & (a)(2). In addition, she alleged that Warren engaged in the FMLA retaliation and interference and violated her rights under the Equal Protection Clause of the Fourteenth Amendment, actionable under 42 U.S.C. § 1983.

Defendants moved for summary judgment on all counts. The district court granted the motion, finding that no reasonable jury could find that defendants violated Title VII, the ADEA, the FMLA or Paterakos's equal protection rights. *Paterakos v. City of Chicago*, No. 21 C 52, 2024 WL 1614991 (N.D. Ill. Mar. 11, 2024). Paterakos has appealed as to her Title VII, FMLA, and equal protection claims. She has dropped her claims of age discrimination.

III. *Analysis*

We review de novo the district court's grant of summary judgment to defendants. We construe the evidence in the light most favorable to Paterakos, the non-moving party, and give her the benefit of all reasonable inferences in her favor. *Lesiv v. Illinois Central Railroad Co.*, 39 F.4th 903, 911 (7th Cir. 2022). Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, Paterakos "must be able to show that a reasonable jury could return a verdict in her favor." *Benuzzi v. Board of Education*, 647 F.3d 652, 662 (7th Cir. 2011). If she has not come forward with evidence sufficient to establish an element essential to her case on which she will bear the burden of proof at trial, we must affirm the grant of summary judgment. *Id.*, quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We first address Paterakos's Title VII and equal protection claims and then her FMLA claims.

A. *Title VII and Equal Protection Race Discrimination Claims*

Title VII makes it unlawful for employers to "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII "protects people of all races, including white people, from race discrimination." *Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022), citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280 (1976). To defeat a motion for summary judgment on the merits of a Title VII race-discrimination claim, a plaintiff must produce evidence that would let a reasonable factfinder find that her race caused an adverse employment action. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). We analyze the substance of Title VII and equal protection claims brought under 42 U.S.C. § 1983 in the same way. The principal difference relevant here is who can be named as a defendant. See *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 750 n.2 (7th Cir. 2006).

Paterakos claims that the city violated Title VII by sus-
pending her three times and assigning her to the DePaul Cen-
ter because she is white. In the district court, she presented
her claim primarily through the burden-shifting framework
adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792
(1973). On appeal, however, she eschews reliance on *McDon-
nell Douglas* and frames her argument under the totality-of-
circumstances test in *Ortiz v. Werner Enterprises*. Her appellate
arguments focus on showing that the city's stated reasons for
suspending her and assigning her to the DePaul Center were
pretexts for racial discrimination. Defendants argue that
Paterakos's one-week transfer to the DePaul Center was not
an adverse employment action and that no reasonable jury
could find that any of the suspensions were motivated by
Paterakos's race.[1]

---

[1] Because Paterakos presented her arguments to the district court
through the *McDonnell Douglas* burden-shifting framework, the court as-
sessed whether Paterakos established a prima facie claim of race discrim-
ination. At the time, Seventh Circuit precedent modified the first element
of the prima facie case for so-called "reverse discrimination" claims
brought by white plaintiffs. E.g., *Runkel*, 51 F.4th at 742. White plaintiffs
had to show background circumstances suggesting that the defendant-
employer had "reason or inclination to discriminate invidiously" against
white people. *Id.* (internal quotation marks omitted), quoting *Gore v. Indi-
ana University*, 416 F.3d 590, 592 (7th Cir. 2005). The district court held that
Paterakos's evidence "just barely create[s] a question of fact concerning
the required background circumstances." In *Ames v. Ohio Dep't of Youth
Services*, 605 U.S. 303 (2025), the Supreme Court held that the "background
circumstances" requirement that we and other circuits had applied is in-
consistent with Title VII's language and the Court's case law construing
that statute. *Id.* at 305–06. As a result, white plaintiffs no longer need to
show background circumstances to make out a prima facie case of race
discrimination under *McDonnell Douglas*. Because the district court did not
grant summary judgment based on the now-overruled background

1. *Assignment to the DePaul Center*

Paterakos argues that her one-week assignment to the De-Paul Center was an adverse employment action because it changed her working hours and office location. An "adverse employment action is some quantitative or qualitative change in the terms or conditions of [the plaintiff's] employment that is more than a mere subjective preference." *Madlock v. WEC Energy Group, Inc.*, 885 F.3d 465, 470 (7th Cir. 2018) (internal quotation marks omitted), quoting *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). The words "terms" and "conditions" cover more than economic or tangible injuries. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). They also encompass harm to an employee's "career prospects" and "humiliating, degrading, unsafe, unhealthy" or otherwise negative changes to an employee's work conditions. *Madlock*, 885 F.3d at 470, quoting *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016). Yet not every change "that makes an employee unhappy is an actionable adverse action." *Id.* at 470, quoting *Nichols v. Southern Illinois Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007).

The district court concluded that Paterakos's one-week assignment to the DePaul Center was not an adverse employment action because she had not identified "any significant disadvantage she experienced due to the temporary change in reporting location." The court applied the standard under then-controlling circuit precedent. See *Boss*, 816 F.3d at 917. That standard was modified in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), where the Supreme Court clarified that a Title

---

circumstances requirement and Paterakos has abandoned the *McDonnell Douglas* framework on appeal, *Ames* does not affect this decision.

VII plaintiff identifying a job transfer as an adverse employment action must still show "some harm respecting an identifiable term or condition of employment." *Id.* at 355. Under *Muldrow*, however, transferees need not show that the harm incurred was "significant," or "serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* (internal quotation marks omitted), quoting *Muldrow v. City of St. Louis*, 30 F.4th 680, 688 (8th Cir. 2022).

Even under *Muldrow*, though, we agree with the district court that the one-week assignment to the DePaul Center to enable social distancing in the earliest stages of the pandemic did not constitute an adverse employment action. Although Paterakos's failure to show "significant" harm from the brief assignment to the DePaul Center is not necessarily decisive, her failure to show that she suffered *any* harm is. The assignment did not diminish Paterakos's job responsibilities, compensation, or benefits or make her otherwise worse off. While it shifted Paterakos's working hours by half an hour and required her to report to a different location, Paterakos has not identified any way that either of these minor changes in her working conditions objectively harmed her. See *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 650 (7th Cir. 2011) (affirming grant of summary judgment for employer in Title VII action: "A change in shift assignments will not normally be sufficient to qualify as an adverse employment action, unless it is accompanied by some other detriment."). The brief assignment to the DePaul Center did not rise to the level of an adverse employment action that could support a Title VII claim.

2. *Pretext*

Federal employment discrimination laws do not limit their protection to perfect employees. An employer can violate those laws by imposing discriminatory discipline, penalizing employees differently for comparable poor performance or misconduct based on their race, sex, national origin, age, disability, or other protected status. See, e.g., *Morris v. BNSF Railway Co.*, 969 F.3d 753, 758 (7th Cir. 2020); *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 592 (7th Cir. 2008). Paterakos argues that defendants' performance-based rationales for the three suspensions were mere pretexts for racial discrimination. Evidence of pretext can be circumstantial evidence of unlawful motives under the broader *Ortiz* test. E.g., *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 911–12 (7th Cir. 2025); *Vassileva v. City of Chicago*, 118 F.4th 869, 874 (7th Cir. 2024). One way to show pretext and thus discrimination can be an employer's failure to take comparable action against other employees for similar poor performance or misconduct.

After taking a fresh look at the evidence, we reach the same conclusion as the district court for the same reasons. On this record, no reasonable jury could find that defendants' performance-based rationales for the three suspensions were mere pretexts for racial discrimination. We also see no evidence of discriminatory discipline.

To establish that an employer's explanation for an adverse employment action is pretextual, a plaintiff does not necessarily need to show that the explanation is factually untrue. Even a true fact can be a pretext if it was not the honest reason for the employer's action. *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023); *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 634 (7th Cir. 1996). Pretext can be proven, among

other ways, by evidence (1) that the employer's explanation has no basis in fact; (2) of "ambiguous or suggestive comments or conduct;" or (3) of "better treatment of people similarly situated but for the protected characteristic." See *Purtue v. Wisconsin Dep't of Corrections*, 963 F.3d 598, 602 (7th Cir. 2020), quoting *Joll v. Valparaiso Cmty. Schools*, 953 F.3d 923, 929 (7th Cir. 2020).

Paterakos compares her case to *Vichio v. US Foods*, where we reversed summary judgment for an employer on the plaintiff's age discrimination claim. There, we rejected the employer's performance-based rationale for discharging the plaintiff. 88 F.4th at 695. We reasoned in part that the plaintiff's record had been "virtually pristine" until the arrival of a new supervisor, and that a reasonable jury could have concluded that the new supervisor's stated reasons for being dissatisfied with the plaintiff's performance were dishonest. *Id.* at 692. According to Paterakos, her claim is similar because Warren began questioning Paterakos's performance on her first day of supervising Room 100 and some of her criticisms were unfair. Paterakos also reprises several arguments that the district court rejected. She asserts that Warren's remark that Paterakos was "too privileged for [Warren] to speak with [her]" is evidence of racial animus. She also argues that Warren treated similarly situated black employees better and that the city deviated from its progressive discipline policy. None of these arguments is persuasive.

Unlike the situation in *Vichio*, Paterakos's record in Room 100 was not "virtually pristine" before Warren became the supervisor. In 2019, Pulphus spoke to Paterakos and two department deputies about Paterakos walking away from her desk without notifying a supervisor. A different supervisor, Vera

Wong, had given Paterakos a poor performance evaluation mere months before Warren's arrival. Wong gave Paterakos three ratings of "does not meet minimum standards of performance" and explained that Paterakos needed "less hold time with callers, less chat time with staff and arrive to work on time and increase call volume." Pulphus's and Wong's evaluations of Paterakos's performance in 2019 were consistent with Warren's assessments in 2020. See *Galvan v. Indiana*, 117 F.4th 935, 940 (7th Cir. 2024) ("If, however, the deficiencies that triggered the termination involved the type of conduct deemed significant to the employer in past evaluations, that would tend to support the employer's claim that the claim of deficient performance was genuinely believed.").

Paterakos has also failed to raise a genuine dispute about the most significant facts on which the city based her suspensions. Regarding the first suspension, Paterakos admitted that she sometimes forgot to leave her phone in not-ready mode when away from her desk, changed her scheduled lunch time without permission, and went on breaks without notifying a supervisor. She also admitted that she used the office fax machine for personal reasons. As for the second suspension, Paterakos admitted that she failed to attend the majority of the June 3 webinar. And for the third, Paterakos admitted to socializing with police officers in or around city hall when she was on FMLA leave, and it is undisputed that she signed in late on two of the days listed in the third pre-disciplinary notice. Paterakos's admissions are consistent with contemporaneous emails circulated among her supervisors and observations made by other ACLSs.

The undisputed facts show that the city's stated reasons for the three suspensions are consistent with the record and

indeed with Paterakos's own admissions. They do not "lack support in the record such as would support an inference of discrimination." *Galvan*, 117 F.4th at 945 (no inference of discrimination where record contained comments over the course of years and complaints consistent with rationale employer gave for plaintiff's termination). That distinguishes her claim from that of the *Vichio* plaintiff, who denied making a comment on which his supervisor relied and more importantly, presented substantial evidence that his immediate supervisors were satisfied with his work. 88 F.4th at 692–93. Paterakos disputes the significance of her misconduct and the reasonableness of Warren's expectations. But we do not sit as a "super-personnel department" determining "whether an employer's expectations were fair, prudent, or reasonable." *Boss*, 816 F.3d at 917. Paterakos has admitted that she failed to comply with defendants' legitimate policies. She has not offered any evidence undermining defendants' assertion that the three suspensions were based on the identified deficiencies in Paterakos's performance. Also, the discipline was not so disproportionate to the performance problems as to invite an inference of pretext. Cf. *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 290–91 (7th Cir. 1999) (jury could find pretext where employer claimed to have fired employee for eating a few snack chips from an open bag left behind in employees' break room).

The district court rejected Paterakos's other arguments regarding Warren's remark at the first pre-disciplinary meeting, better treatment of similarly situated employees, and the City's progressive discipline policy. The court explained that no reasonable jury could find that Warren's isolated comment about privilege "had anything to do with Paterakos' protected characteristics." The court also went through each of

Paterakos's proposed comparators for each suspension and explained why a reasonable jury could not conclude that any of them "engaged in conduct of the same severity or frequency" as Paterakos. The court finally determined that Paterakos presented no evidence that the city did not follow its progressive discipline policy. Paterakos's arguments on all three grounds are meritless for the reasons explained by the district court. We have nothing to add to this portion of the district court's careful and thorough opinion. See *Paterakos*, 2024 WL 1614991, at *12–14.

In sum, Paterakos has not presented evidence from which a reasonable jury could find that the city suspended her because she was white rather than because of consistent performance issues. The district court properly granted summary judgment for defendants on her race-discrimination claims under Title VII and the Equal Protection Clause.

B. *FMLA Retaliation and Interference Claims*

Paterakos also contends that the city and Warren interfered with her FMLA rights and retaliated against her for exercising her FMLA rights by subjecting her to a five-day suspension. The FMLA entitles eligible employees to take twelve weeks of leave during any twelve-month period for reasons that include caring for a parent with a serious medical condition. 29 U.S.C. § 2612(a)(1)(C). An employer may not interfere with or deny an employee's exercise of her right to FMLA leave. 29 U.S.C. § 2615(a)(1). FMLA interference is "not limited simply to the denial of leave." *Preddie v. Bartholomew Consolidated School Corp.*, 799 F.3d 806, 818 (7th Cir. 2015). It also includes "'us[ing] the taking of FMLA leave as a negative factor in employment actions' and 'discouraging an employee from using such leave.'" *Id.*, quoting 29 C.F.R. § 825.220(c), (b);

accord, *Ziccarelli v. Dart*, 35 F.4th 1079, 1085–89 (7th Cir. 2022) (clarifying elements of interference claim).

To prevail on a claim of FMLA interference, an employee must show that: "(1) he was eligible for FMLA protections; (2) his employer was covered by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) his employer 'interfered with, restrained, or denied FMLA benefits to which he was entitled.'" *Juday v. FCA US LLC*, 57 F.4th 591, 595 (7th Cir. 2023), quoting *Ziccarelli*, 35 F.4th at 1089. An employee claiming retaliation in violation of the FMLA must show that: "(1) he engaged in FMLA-protected activity; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the two." *Id.* at 596. The FMLA, however, does not insulate employees from discipline for abusing their leave rights. In cases involving disciplinary suspensions, an employer may defeat FMLA liability by showing that it had an "honest suspicion" that an employee was abusing her FMLA rights. *Id.* at 595, quoting *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 681 (7th Cir. 1997).

As the district court explained, Paterakos has not presented any evidence that raises a genuine issue of fact about whether her supervisors honestly believed she was abusing her FMLA leave. See *Paterakos*, 2024 WL 1614991, at *16. Recall that the third suspension was premised on Paterakos (1) socializing with police officers in or around city hall; (2) talking on her cell phone in or around city hall; and (3) signing in late for work despite being at city hall. Paterakos admitted that she socialized with police officers during her FMLA time and signed in late on the days listed on the notice of pre-disciplinary investigation. Both Warren and Pulphus

personally observed instances of such conduct, which led them to believe that Paterakos was abusing her leave. See *Vail v. Raybestos Products Co.*, 533 F.3d 904, 906–07, 909–10 (7th Cir. 2008) (observation that employee mowed lawns on a morning that she took FMLA leave for a migraine supported employer's honest suspicion defense). Although Paterakos contends that defendants' reliance on Pulphus's and Warren's observations is not credible, she does not cite any evidence or make any meaningful argument as to why we should not credit their uncontradicted explanation.

The observations about Paterakos talking on the phone at city hall during her FMLA leave need a closer look because at least some of Paterakos's phone calls were for the purpose of managing her father's health. To the extent that defendants believed that those phone calls were outside of the scope of Paterakos's FMLA leave, they were mistaken. But as we held in *Kariotis v. Navistar Int'l Transp. Corp.*, an employer may establish its honest-belief defense to FMLA liability even if the employer was in fact mistaken in that belief. 131 F.3d at 681.

In *Kariotis*, the plaintiff extended her FMLA leave for a necessary post-operative medical procedure. *Id.* at 674. After she returned to work, her employer refused to reinstate her to her former position because it believed she had extended her FMLA leave for fraudulent reasons. *Id.* at 675. The employer formed that belief based on videotapes made by private investigators showing the plaintiff walking, driving, and pushing a grocery cart—actions that in the employer's view were inconsistent with being disabled or physically impaired. Even though the plaintiff's physician later confirmed that she needed the procedure and the employer's investigation "left something to be desired," we held that the employer's honest

suspicion that the plaintiff was misusing her FMLA leave defeated FMLA liability. *Id.* at 675, 681.

As in *Kariotis*, the procedure that defendants followed before suspending Paterakos for abusing her FMLA rights left something to be desired. Warren testified that she never received any training on what constitutes protected activity under the FMLA and that Paterakos never informed her that her phone calls were related to her father's care. In lieu of any concrete information, Warren assumed based on her own FMLA leave and general managerial experience that taking phone calls could not be related to caring for a family member. That assumption was mistaken, but the fact that Warren was ignorant of Paterakos's reason for taking FMLA leave and made unsupported assumptions about Paterakos's conduct does not suggest that she did not really believe Paterakos was abusing her FMLA leave. Cf. *Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016) (even if a decision was "mistaken, ill considered or foolish, … so long as the employer honestly believes those reasons, pretext has not been shown" (internal quotation marks omitted)), quoting *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005).[2]

---

[2] Paterakos observes that the third notice of pre-disciplinary investigation listed times that Warren or Pulphus purportedly observed her on the phone that did not match her cell phone records. She argues that this inconsistency casts doubt on the honesty of defendants' suspicions. The third notice of progressive discipline said, however, that Paterakos was socializing "and/or" talking on her cell phone during the listed times, so there is not necessarily any inconsistency between Paterakos's cell phone records and defendants' final rationale for disciplining her. Regardless, any inconsistency does not change the fact that Warren and Pulphus personally observed Paterakos socializing outside of city hall, talking on the phone, and swiping in late on the days listed on the notice. Because

The judgment of the district court is

AFFIRMED.

---

nothing in the record suggests they dishonestly relied on those observations to suspend Paterakos, any inconsistency between the exact time stamps in the notice and in her cell phone records does not present a genuine issue of material fact.